# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

THOMAS WADE ROBINSON,

                Plaintiff,

      v.

COUNTY OF SAN BERNARDINO, et al.,

                Defendant.

Case No. ED CV 23-836-DMG (PVCx)

**ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [77]**

-1-

On February 27, 2026, Defendant San Bernardino County ("the County") filed its Motion for Summary Judgment as to Plaintiff Thomas Wade Robinson's *Monell* claims, which are the sole remaining claims in this case.  [Doc. # 77 ("MSJ").]  The MSJ is fully briefed.[1]  [Doc. ## 88 ("Opp."), 92 ("Reply").]  The Court held a hearing on May 22, 2026.  Having carefully considered the parties' arguments, the Court **GRANTS** the MSJ.

# I.

# PROCEDURAL BACKGROUND

Plaintiff Robinson filed the instant action on May 5, 2023 as a *pro se* prisoner, alleging constitutional violations by the County and its employees under 42 U.S.C. section 1983.  [Doc. # 1 ("Complaint").]  On September 26, 2023, Honorable Pedro V. Castillo, the United States Magistrate Judge assigned to the case, screened and dismissed the Complaint with leave to amend, pursuant to 28 U.S.C. section 1915A(a).  [Doc. # 14.] On October 16, 2023, Robinson filed a First Amended Complaint alleging one general claim against the County, and seven claims against six individual named defendants. [Doc. # 15 ("FAC").]   Judge Castillo screened the FAC and filed a Report and Recommendation that this Court dismiss Claims Two through Five against the individual defendants with prejudice.  [Doc. # 21.]  The Court accepted Judge Castillo's findings, conclusions, and recommendations, and dismissed Claims Two through Five of the FAC with prejudice.  [Doc. # 23.]  As a result, all six individual defendants were dismissed from the case, and the sole remaining Defendant is San Bernardino County.

Robinson filed his operative Second Amended Complaint on March 25, 2024. [Doc. # 22 ("SAC").]  Robinson alleges two claims against the County under 42 U.S.C.

---

[1] On May 19, 2026, after briefing was completed, Robinson late-filed a Response to the County's Objections delineated in its Response to Plaintiff's Statement of Genuine Disputes of Material Fact. [Doc. # 94.]  The County filed an objection to Robinson's May 19, 2026 Response on the ground that he did not seek leave from the Court to file what is essentially a sur-reply, in violation of Local Rule 7-10. [Doc. # 95.]  While Robinson's Response to the County's Objections was late, the Court exercises its discretion not to strike it.  The County will have the opportunity to respond, if necessary, at the hearing on May 22, 2026.   The County's Objection to Robinson's late-filed Response to the County's Objections is therefore **OVERRULED**.

section 1983:   (1) Fourteenth Amendment violation for deliberate indifference to a serious medical condition; and (2) Eighth Amendment violation for unconstitutional conditions of confinement relating to razor sanitation practices.  *Id.*  The County now moves for summary judgment on both claims.

## II.

## FACTUAL BACKGROUND[2]

The County filed a Statement of Uncontroverted Facts.  [Doc. # 78 ("SUF").]  Robinson filed a Statement of Genuine Disputes of Material Fact and Additional Material Facts.  [Doc. # 91 ("SGD" or "AMF").]  The County filed a Response to Robinson's SGD and AMF.[3]  [Doc. # 93 ("RSGD").]

At all relevant times, Robinson was a pre-trial detainee in the custody of the County.  Corrected Declaration of Nicolette Glazer ("Glazer Decl.") at ¶ 3 [Doc. # 91].

### A.    Medical Care

#### 1.    Robinson's Shoulder Injury and Treatment

On November 20, 2021, Robinson injured his right shoulder while in custody and playing basketball at the Glen Helen Rehabilitation Center ("GHRC").  SUF at ¶ 1. Immediately after sustaining the injury, Robinson was seen by a nurse at GHRC, who did

---

[2] The facts in this section are uncontroverted, unless otherwise stated.  Many of the parties' purportedly disputed facts are not in fact controverted by the evidence, and the Court therefore cites to them as uncontroverted facts.  In addition, the Court deems facts to be uncontroverted where a party does not provide evidence to support an alleged dispute.  To the extent the parties' characterization of evidence in their statement of facts is unsupported by the cited evidence, the Court referred directly to the evidence in formulating this factual background.  The Court has reviewed the entire record but only discusses the uncontroverted facts that are necessary to or affect its analysis.  The Court rules on the evidentiary objections only insofar as the evidence is relevant to the Court's analysis.  To the extent the Court does not rely on evidence to which an evidentiary objection was interposed, the objection is **OVERRULED** as moot.

[3] In its Response to Robinson's Additional Material Facts, the County makes a blanket objection to many paragraphs under Federal Rule of Evidence 402.  The County reiterates the same objection as to each paragraph:  "This fact is irrelevant to Plaintiff's Monell claim and is insufficient to prove the required elements of such claim."  *See* RSGD at ¶¶ 39–125.  To the extent the Court relies on evidence in Robinson's AMF, the Court finds that the evidence is relevant and **OVERRULES** the County's blanket Rule 402 objection.

not provide treatment, but called an ambulance to transport Robinson to a hospital. Declaration of Seonhae Shin ("Shin Decl."), Ex. 2 ("Robinson Depo.") at 95:7-96:12, 96:16–25 [Doc. # 79].  Robinson was transported to the Emergency Department at Arrowhead Regional Medical Center ("ARMC").  SUF at ¶ 2; Shin Decl., Ex. 8.  After taking a CT scan and X-ray of Robinson's head and right shoulder, a doctor at ARMC determined Robinson's right shoulder had "superior subluxation of the clavicle at the AC joint.  Moderate AC degenerative change.  No acute fracture or dislocation."[4]  SGD at ¶ 1; Shin Decl., Ex. 8.  Robinson was provided with a shoulder sling and ibuprofen before being transported back to GHRC.  Robinson Depo. at 110:3–25.

Upon returning to GHRC on November 21, 2021, Robinson was reevaluated by a nurse, Judith McGee.  SUF at ¶ 2; Declaration of Narcie Sousa ("Sousa Decl."), Ex. 20 at SB 1038–39 [Doc. # 80].  McGee noted the following plan:  "Pt to be put on a sling for comfort," follow up "with orthopedics at the next available appointment," and 600 milligrams of ibuprofen "until cleared by ortho."  *Id.*  McGee noted that Robinson "arrived with sling on right arm.  Sling changed to jail approved."  *Id.*  According to Robinson, changing into the jail-approved arm sling caused him extreme pain because it was small and went around his neck instead of his shoulder.  Glazer Decl., Ex. A ("Robinson Decl.") at 132:17–25, 133:4–13.  Additionally, McGee gave Robinson Tylenol instead of ibuprofen, despite Robinson mentioning he cannot take Tylenol because he had "fibrosis on [his] liver*."  Id*. at 110:20 –111:6, 136:15–137:9.  On November 23, 2021, Robinson was seen by a physician's assistant ("PA") and a nurse. SGD at ¶ 3.  The nurse issued a "chrono" for a single man chain during transportation.[5] *Id.*  The PA's treatment plan notes included an "ortho referral" and an order for Tylenol. Sousa Decl., Ex. 20 at SBC 1036–37.  Between November 28 and 29, 2021, Robinson

---

[4] "AC" refers to the acromioclavicular joint.

[5] A "chrono" is a prescription or order from medical staff.  *See* SUF at ¶ 28.

-4-

complained of pain in his right shoulder and a PA refilled an order of Tylenol. *Id.* at SBC 1034.

On December 1, 2021, a nurse at GHRC issued a "chrono" for a sling and a single man chain for two weeks. *Id.* On December 3, 2021, Robinson informed a nurse that he was still in pain and could not take Tylenol because he has "liver cirrhosis." *Id.* at SBC 1032. Robinson requested Motrin instead. *Id.* The nurse noted that Robinson is scheduled to see "ortho" but the "appt pending appt date." *Id.* On December 8, 2021, Robinson was evaluated by a nurse who observed that Robinson was not wearing his sling or a shirt. Sousa Decl., Ex. 20 at SBC 1030; SUF at ¶ 5. The nurse also observed that Robinson was able to put his shirt on over his head without any decreased range of motion. *Id.* On December 9, 2021, Robinson was seen by an orthopedic specialist, Dr. Mudge, who provided Robinson with a clavicle strap, arm sling, and an order for a single man chain for six weeks.[6] Robinson Decl. at 144:5–17; Sousa Decl., Ex. 20 at SBC 1030.

On July 6, 2022, court staff informed medical staff at the jail that although Robinson was observed wearing an arm sling, Robinson was moving his arm "with full range of motion and appeared to not need the assistance of the sling at that time." SUF at ¶ 8; Sousa Decl., Ex. 20 at SBC 1021. As a result, a nurse at the jail scheduled an evaluation to see if Robinson still needed the sling. *Id.* On July 11, 2022, a PA reviewed "Ortho recommendations" and noted that Robinson was "discharged from Ortho clinic" and no longer needed a sling. SUF at ¶ 9; Sousa Decl., Ex. 20 at SBC 1021. On July 12, 2022, Robinson went to court without a sling. *Id.*

Approximately 10 months later, on May 19, 2023, Robinson complained of nerve twitching in his right elbow. SUF at ¶ 10. Medical staff at the jail evaluated Robinson and noted that his right shoulder displayed deformity but otherwise exhibited full range of motion. *Id.* A PA evaluated Robinson again on May 26, 2023 and noted, "[n]ormal

---

[6] Robinson testified that, after December 9, 2021, he never saw an orthopedic provider again. Robinson Decl. at 151:2–25.

gait and ROM, moving all extremities equally." Sousa Decl., Ex. 20 at SBC 1009–10. On July 27, 2023, Dr. Jason Calinisan reviewed Robinson's chart and denied a request for a single man chain after noting that Dr. Mudge previously issued a single man chain "chrono" for six weeks on December 9, 2021. SUF at ¶ 12. On August 1, 2023, PA Victoria Bennet examined Robinson and recommended "continued strengthening/exercise as tolerated." RSGD at ¶ 13; Sousa Decl., Ex. 20 at SBC 999–1000.

On February 7, 2024, Robinson continued to complain of right shoulder pain and decreased range of motion, for which he requested surgical intervention. Sousa Decl., Ex. 20 at SBC 985. A PA noted, however, that orthopedics saw Robinson in 2022 and determined no surgical intervention was needed. *Id.* On March 25, 2024, an occupational therapist evaluated Robinson and noted that Robinson had decreased range of motion in his right shoulder. SUF at ¶ 17; Sousa Decl., Ex. 20 at SBC 523–27. The occupational therapist referred Robinson to weekly occupational therapy for eight weeks as well as a home exercise program. *Id.* At the time of his deposition, Robinson did not recall ever being provided with a home exercise program. Robinson Depo. at 166:5–9.

On March 29, 2024, Robinson met with Dr. John Brewington, who found that Robinson had "[n]ear full range of motion of the shoulder." Sousa Decl., Ex. 20 at SBC 982–83. Dr. Brewington noted that Robinson wished to discontinue attending physical therapy. *Id.* Dr. Brewington discussed with Robinson that "nonsurgical intervention for grade 3 separation of the AC joint is common" and advised him to continue with the home exercise program. *Id.* In April and May 2024, Robinson declined to receive additional occupational therapy from ARMC for his right shoulder. *Id.* at SBC 512, 520–21, 980. Robinson testified that the reason he declined further occupational therapy was because of pain and discomfort he experienced during transportation to the hospital. Robinson Decl. at 169:3–19.

//

//

-6-

## 2. The County's Medical Expert

Dr. Daniel Kaplan is a board-certified orthopedic surgeon and a retained medical expert on behalf of the County. Declaration of Daniel Kaplan ("Kaplan Decl.") at ¶¶ 1, 3 [Doc. # 81]. Dr. Kaplan reviewed the deposition transcripts, health services requests, medical files and records, reports, and notes relating to Robinson's case and prepared several reports detailing his medical opinions, findings, and conclusions. *Id.* at ¶¶ 5–6. Upon reviewing the records, Dr. Kaplan concluded "that the medical treatment provided to Plaintiff was appropriate, timely, and within the medical standards." *Id.* at ¶ 5.

Dr. Kaplan testified to the following relevant facts during his deposition. For a Grade 3 AC separation, Dr. Kaplan's "standard of care is to give the person measures of comfort" such as using a sling, ice, and Tylenol. Glazer Decl., Ex. C ("Kaplan Depo.") at 20:12–24. In his practice, Grade 3 AC separations are treated non-operatively. *Id.* at 21:11–16. Plaintiff's counsel posed the following question: "At what point in treatment where we have a continuing pain after three-plus years, exam with limited range of motion on and off, would a treating physician reassess a Grade III AC injury and whether-- and consider whether if conservative care is failing?" *Id.* at 73:8–12. Dr. Kaplan gave the following response:

> "So I don't think your client had an appropriate gambit of conservative care, so we can't really say it failed. Because the records I have been provided with were that he was prescribed therapy but he only attended one time. Now, if that's not correct, that would change my opinion. But based on my understanding, he went one time and decided he didn't want to go to [sic] any more. An appropriate conservative regimen would have been him attending therapy as prescribed and following through with the home exercise regimen. And I would submit to you, if that occurred, he would have had improved function and less pain. But I don't think you can make the statement that his conservative care had failed, because I don't think he had appropriate conservative care due to his lack of cooperation."

*Id.* at 73:8–74:10.

//

### 2. County Policy Regarding Medical Care

The County maintains written policies regarding medical care. Sousa Decl. at ¶ 6; *see also id.* at ¶¶ 21–22, 24–27, 31–28 (listing exhibits of the County's policies and procedures). Generally, the County provides its deputies and medical staff with training regarding medical care for inmates. *Id.* at ¶¶ 7–8. Registered Nurses "are licensed, receive initial and ongoing access to current procedures, and undergo annual competency approval." *Id.*

## B. Electric Razor Sanitation

### 1. County Policy Regarding Electric Razor Sanitation

Generally, the County provides electric razors only to inmates with special medical needs. SUF at ¶ 28. Inmates may request a "chrono" for an electric razor from medical staff, which typically lasts one year and must be renewed annually. *Id.*

The County maintains written Inmate Grooming Policies which provide that "[g]rooming equipment shall be disinfected before and after each use by methods approved by the State Board of Barbering and Cosmetology. Disinfectant shall be approved by the Environmental Protection Agency (EPA) and authorized for use by the Chief Medical Officer." Sousa Decl., Ex. 9 (policy number 925.00 regarding "grooming equipment"). The policy further provides that "[g]rooming equipment shall be sprayed with the disinfectant and left on for a minimum of one minute before being wiped clean" and that "[g]rooming equipment shall not be immersed in any disinfectant solution." *Id.* (policy number 12.900 regarding "inmate grooming"). The High Desert Detention Center ("HDDC") Facility Policy Manual specifies that electric razors "shall be disinfected in between inmate use." Sousa Decl., Ex. 17 (policy number 12.925.00 regarding "electric grooming equipment"). There were no changes to the policies pertaining to cleaning the grooming equipment during the COVID-19 pandemic. Glazer Decl., Ex. E ("Salcedo Depo.") at 40:13–21. The County's written policy is "readily available" to all deputy sheriffs. *Id.* at 41:10–22, 43:21–44:2.

//

-8-

According to Sergeant Narcie Sousa, electric razors are cleaned between each use per County policy. Sousa Decl. at ¶ 14. Depending on the facility, the unit deputy either personally cleans the electric razor or will provide sanitation fluid to inmates to sterilize the electric razor before and after each use. *Id.* The County provides training to its employees on the distribution, handling, cleaning, and sanitizing of electric razors. *Id.* at ¶ 15; *see also id.*, Ex. 19 (PowerPoint slides regarding inmate grooming procedures).

Deputy Daniel Salcedo is the County's Federal Rule of Civil Procedure 30(b)(6) representative for policies pertaining to sanitization of grooming equipment. *See* Glazer Decl., Ex. D and Ex. E ("Salcedo Depo."). Salcedo trains deputies on policy changes and updates to the law, including on Title 15 minimum standards. Salcedo Depo. at 10:3– 11:4. Each facility conducts its own separate trainings—Salcedo is not in charge of providing all the trainings himself. *Id.* at 44:9–10, 44:21–23; RSGD at ¶ 113. The training "could be completed by a training unit if the facility has a training unit, a[n] experienced deputy. It [is] up to the sergeant's discretion to see who is going to be training on a particular topic." Salcedo Depo. at 44:17–21. Salcedo is not familiar with the presentation attached as Exhibit 19 to the Sousa Declaration. *Id.* at 37:1–11.

CaviCide and CleanCide are names of cleaning solution brands that the County has used to sanitize electric razors. *See id.* at 20:17–21:2 (discussing CaviCide); Sousa Decl., Ex. 19 (discussing CleanCide).

### 2. Robinson's Testimony Regarding Electric Razor Sanitation

From June 2017 until June 2020, Robinson was incarcerated at the High Desert Detention Center ("HDDC"). RSGD at ¶ 28. In 2017, Robinson received a permanent "chrono" for an electric razor because he had sensitive skin, low PH level, and Hepatitis C. Robinson Decl. at 263:16–264:12. During his incarceration at HDDC, Robinson testified that he only had access to an electric razor "on a rare basis" and it was "very difficult to get[.]" *Id.* at 264:15–22. Initially, he only had access to an electric razor upon request, but later, the facility started to provide an electric razor to a specific housing unit of 75 people on a single day of the week. *Id.* at 264:15–265:24, 197:15–24,

199:16–18.  Not every person in the housing unit would use the electric razor due to time constraints or personal reasons, including concerns about cross-contamination.  *Id.* at 201:16–202:2, 202:19–25, 203:2–11.  According to Robinson, the electric razor was not cleaned in between uses and he was not provided with cleaning solution, such as CaviCide, despite repeatedly requesting it.  *Id.* at 204:18–20, 206:6–17, 222:7–10, 223:1–10.

Robinson was incarcerated at GHRC between June 2020 and October 2022.  RSGD at ¶ 29; Sousa Decl., Ex. 11.  Robinson's requests for deputies to clean the electric razors or to have access to cleaning solution were repeatedly denied.  Robinson Decl. at 222:23–223:10.  Occasionally, an employee of GHRC would put out a gray, rectangular tub, full of industrial cleaning fluid that is used to clean floors.  *Id.* at 270:12–25.  Robinson would take the head of the electric razor and shake it in the tub to clean it.  *Id.*

Robinson was transferred to West Valley Detention Center ("WVDC") in October 2024.  RSGD at ¶ 31.  Robinson testified that at WVDC, "[t]he problem is they don't put any CaviCide or any type of antisterilization.  And so people just grab [the electric shaver], use it, they cross-contaminate, [and] get hepatitis C."  Robinson Depo. at 195:5–19.

Robinson has not been diagnosed with any communicable disease resulting from use of an unsanitary electric razor.  RSGD at ¶ 32. Robinson  fears  possibly  contracting communicable diseases.  Robinson Decl. at 223:18–20.

### III.

### LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

## IV.

## DISCUSSION

Under 42 U.S.C. section 1983, a plaintiff may bring a civil action for the deprivation of constitutional rights by an individual acting under color of state law. 42 U.S.C. § 1983; *see Lindke v. Freed*, 601 U.S. 187, 194–95 (2024). The two essential elements of a Section 1983 claim are that the defendant acted under color of law, and his conduct deprived the plaintiff of a constitutional right. *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011).

A government entity may be held liable under 42 U.S.C. section 1983 when "a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). To establish such liability, Plaintiff must show that: (1) he possessed a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the

policy amounts to deliberate indifference to his constitutional right; and (4) the policy is the moving force behind the constitutional violation. *Id.* (citing *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).  Plaintiff can show the existence of a policy in one of three ways:  (1) by showing the entity acted "pursuant to an expressly adopted official policy"; (2) by showing the entity had a "longstanding practice or custom" of, for example, failing to train employees adequately; or (3) by showing an official with final policy-making authority ratified a subordinate's unconstitutional decision or action.  *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021) (citations omitted).

The County's MSJ focuses entirely on Robinson's failure to demonstrate that it had an unconstitutional policy or practice.  *See generally* MSJ; Reply.  The County contends that "[e]ven if Plaintiff can establish that his constitutional rights were violated during [his] detention at San Bernardino County facilities," Robinson has no evidence that the County had a policy, custom, or practice that was the "moving force" behind the constitutional violation, and therefore, the Court should grant summary judgment in its favor.  MSJ at 17; *see Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (moving party can carry its initial burden of production by showing that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden at trial).  In his Opposition, Robinson does not point to any express policy that is the moving force behind his alleged constitutional violations. *See generally* Opp.  Instead, Robinson argues *Monell* liability under a ratification theory and a failure-to-train theory. *See id.* at 9–12.

The Court assumes *arguendo*, without deciding, that Robinson's constitutional rights were violated, and proceeds to assess each of his theories of liability in turn.

## A.     Ratification

A municipality may be liable under Section 1983 if an official with final decision-making authority ratified a subordinate's unconstitutional decision or action.  *Gordon*, 6 F.4th at 974.  "[R]atification requires, among other things, knowledge of the alleged

constitutional violation." *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999). A plaintiff must also "prove that the policymaker approved of the subordinate's act" because "it is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval." *Id.* at 1239. Here, Plaintiff must establish a genuine issue of material fact regarding whether ratification occurred.

In his Opposition, Robinson states that he "has shown that a county official with final policymaking authority whose name is not known to Plaintiff but is known to Defendants, ratified all actions here by determining said actions to be 'within policy.'" Opp. at 10. In support of this conclusory statement, Robinson cites to the entirety of Sergeant Sousa's declaration, without any further explanation. *Id.* Given that Robinson openly admits that he does not know the identity of a county official with final decision-making authority who "ratified" the underlying actions here, the Court assumes that Robinson is not arguing that Sergeant Sousa was the final decision-maker. Nor is there evidence to support such an argument. In failing to identify an official with final decision-making authority, Robinson necessarily fails to show that such official *knew* of and approved the alleged constitutional violations here.

In sum, Robinson has failed to establish any genuine issue of material fact regarding whether ratification occurred for either of his claims.

**B.     Failure-to-Train**

A municipality's failure to train "may amount to a policy of 'deliberate indifference,' if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *Dougherty*, 654 F.3d at 900. Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal citation and quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62. That is because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be

said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

The Supreme Court cautions that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61. Mere negligence in training is insufficient to give rise to *Monell* liability. *Doughtery*, 654 F.3d at 900. To establish *Monell* liability under a failure-to-train theory, Plaintiff must prove: (1) a constitutional violation; (2) a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153–54 (9th Cir. 2021).

### 1. Medical Care

Robinson contends he has raised a "genuine factual dispute that there is a systemic and pervasive deficient policies and training regarding failure to follow outside medical providers plans of treatment [and] proper and timely medical care[.]" Opp. at 11. Robinson argues that "staff repeatedly failed to follow ER recommendations or provide conservative care . . . reflecting a custom of substandard implementation or deliberate indifference in training on outside specialist directives."[7] Opp. at 15–16. As evidence of improper care, Robinson points to Nurse McGee's actions of changing his arm sling and providing Tylenol instead of ibuprofen, and the three-week delay in seeing an orthopedic specialist.

Setting aside the question of whether these allegations give rise to a constitutional violation, even when construing the evidence in the light most favorable to Robinson, no reasonable jury could find that the facts presented constitute a municipal training policy amounting to deliberate indifference. Aside from the allegations he has made regarding

---

[7] Robinson repeatedly argues that "Defendant's medical expert, Dr. Daniel Kaplan, has opined that Plaintiff did not receive appropriate conservative care." *See* Opp. at 7, 14, 15. Plaintiff's counsel takes Dr. Kaplan's deposition testimony out of context. Dr. Kaplan attributed the lack of conservative care to Robinson's own "lack of cooperation" and not to the County's failure to provide such medical care. *See* Kaplan Depo. at 73:8–74:10.

-14-

his own situation, Robinson fails to provide any evidence of a County-wide pattern or practice of jail medical staff failing to follow treatment plans and provide timely medical care. Moreover, Robinson does not point to any evidence that the County's training was inadequate.

Accordingly, Robinson's fails to set forth a genuine material dispute of fact as to *Monell* liability based on a failure-to-train for his medical indifference claim.

### 2. Electric Razor Sanitization

Robinson contends that he has raised a genuine issue of material fact that the County's training on electric razor sanitization was constitutionally deficient. The primary evidence Robinson points to is his own testimony that deputies repeatedly failed to clean electric razors between uses and failed to provide cleaning solutions to inmates. While there is evidence that Robinson asked individual deputies for cleaning solutions on numerous occasions, and submitted grievances through the jail system, there is no evidence in the record that *the County* had actual or constructive notice of a constitutionally significant gap in its *training program*. *See Kirkpatrick v. Cnty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (such proof usually requires a plaintiff to demonstrate a "pattern of similar constitutional violations by untrained employees."). The thrust of Robinson's claim is that the "shared-razor practice poses a substantial risk of serious harm to Plaintiff given his chronic hepatitis and known comorbities." Opp. at 14. Robinson points to no admissible evidence of prior incidents where inmates contracted communicable diseases from using shared electric razors, thereby giving the County notice of a constitutionally significant gap in its training program. Robinson's bare assertion that "the need for better training was obvious" is insufficient. Opp. at 16. The central inquiry here is, *who* was it obvious to and *how* was it made obvious? Even construing the evidentiary record in the light most favorable to Robinson, there is no evidence from which the Court can draw a reasonable inference that the need for better training was known to or should have been known to the County, as opposed to individual officers within the facilities to whom he complained.

There is a "narrow range of circumstances" where evidence of a pattern of constitutional violations is not necessary to succeed on a *Monell* claim. *Kirkpatrick*, 843 F.3d at 794. "Such a situation is 'rare'—'the unconstitutional consequences of failing to train' must be 'patently obvious' and the violation of a protected right must be a 'highly predictable consequence' of the decision not to train." *Id.* (quoting *Connick*, 563 U.S. at 63). The facts here, viewed in the light most favorable to Robinson, do not come close to establishing the rare situation. Accordingly, Robinson fails to raise a genuine dispute of material fact that the County should be liable under *Monell* for failure-to-train with regard to its electric razor sanitation policy.[8]

## V.

## CONCLUSION

For the foregoing reasons, the Court finds there is no triable issue of *Monell* liability. The Court therefore **GRANTS** the County's MSJ as to both of Robinson's *Monell* claims (Claims One and Six). Judgment in favor of Defendants will issue accordingly. All pretrial and trial dates and deadlines are hereby **VACATED**.

**IT IS SO ORDERED.**

DATED: May 22, 2026

_____
DOLLY M. GEE
CHIEF UNITED STATES DISTRICT JUDGE

---

[8] Robinson vaguely argues that the County's sanitization policy is unconstitutional because it requires a minimum of one minute of disinfecting, as opposed to the three to five minutes recommended on Cavicide's manufacturing label. Opp. 7, 16. To the extent Robinson is asserting that the County's express policy amounts to deliberate indifference to his constitutional rights, this argument fails for multiple reasons. First, Robinson cherry picks one instruction—out of several provided on the manufacturer's label—without providing any justification for why that one instruction applies in this context. See Glazer Decl., Ex. G (e.g., recommendation for disinfecting for 30 seconds if using as a precleaning decontaminant spray versus disinfecting for three minutes if disinfecting "non-instrument surfaces"). Second, Robinson provides no authority or plausible argumentation that failure to follow the manufacturer's product instruction could be the moving force behind the alleged constitutional violation. This argument is as unavailing as the unsupported contention that the County had a policy or practice not to disinfect the electric razors at all.